**UNITED STATES DISTRICT COURT**
**District of Delaware**

| | |
|---|---|
| **In Re Buckeye Partners L.P. Merger Litigation** | **Civil No. 1:20-cv-960-RGA** |
| ------------------------------------ | |
| WALTER E. RYAN, JR., individually and on behalf of others similarly situated, | Transferred from SD Texas 4:19-CV-02645 |
|        Plaintiff, | |
| v. | |
| BUCKEYE PARTNERS, L.P., And CLARK C. SMITH, PEITER BAKKER, BARBARA M. BAUMANN, BARBARA J. DUGANIER, JOSEPH A. LASCALA, JR., MARK C. MCKINLEY, LARRY C. PAYNE, OLIVER G. RICHARD, III, FRANK S. SOWINSKI, MARTIN A. WHITE, and IFM INVESTORS PTY LTD, IFM GLOBAL INFRASTRUCTURE FUND, HERCULES INTERMEDIATE HOLDINGS LLC and HERCULES MERGER SUB LLC Defendants. | **PLAINTIFF'S THIRD AMENDED CLASS ACTION COMPLAINT** Jury Trial Demanded |

Plaintiff Walter E. Ryan Jr. ("Plaintiff" or "Mr. Ryan"), individually and on behalf of all others similarly situated (the "Class"), alleges on personal knowledge, investigation of his counsel, and on information and belief, as follows:

## SUMMARY DESCRIPTION OF CLAIMS

1.     Plaintiff, for himself and for the other unitholders of Buckeye Partners L.P., ("Buckeye" or the "Company") complains of the actions of Defendants, including, that unitholders

1

of Buckeye were cashed-out of their units in a transaction that was misrepresented to unitholders, and in which unitholders were further harmed by Defendants' pre-closing manipulation of the Company's finances and closing the merger in a way to unfairly capture Buckeye's substantial pre- and post-closing earnings for the Buyer, but have those earnings taxed to the cashed-out unitholders.

## RELEVANT HISTORY OF THE CASE TO DATE

2.     The merger at issue in this case was originally announced May 10, 2019, followed shortly thereafter by a number of PSLRA[1] securities fraud filings in Federal District Courts in New York, Houston, and Delaware, most of which were transferred to Houston on stipulations to Defendants' requests for "Merger Mootness" settlements, and in the process of "Merger Mootness" settlements, providing no value for unitholders.  On September 6, 2019, Plaintiff Ryan intervened and sought Lead Plaintiff and Lead Counsel status, which was granted on December 10, 2019.   Pursuing the substantial claims asserted herein, Plaintiff Ryan filed his amended complaint on December 23, 2019, asserting claims regarding the manner in which unitholders would be taxed on items the Defendants captured for the buyer.  Defendants thereupon moved to transfer the case to this District on January 13, 2020.  Following Lead Plaintiff Ryan's Motion for Class Certification, Defendants' Motion to Stay Class Certification Proceedings was granted for 90 days until July 19, 2020, and on July 17, 2020, U.S. District Judge Hon. Alfred H. Bennett granted the Motion to Transfer to this Court.

3.     This Third Amended Complaint reflects the assertions in Lead Plaintiff Ryan's (i) original proposed complaint (filed before the merger's closing), (ii) the Amended Complaint (filed December 23, 2019 after the merger's closing, but before Buckeye issued the required IRS Forms

---

[1] The Private Securities Reform Act of 1995, Pub.L. 104-67, 15 U.S.C. §78u-4.

2

K-1 to the cashed-out unitholders) and (iii) brings the facts to the current situation (reflecting the information contained in the two sets of tax information returns issued to the cashed-out unitholders that demonstrate further injury to Buckeye's unitholders).

## **FACTUAL ALLEGATIONS OF THE CLAIMS**

4.        This is a unitholder class action brought by Lead Plaintiff Walter E. Ryan, Jr. for himself, and for a class of public unitholders[2] of Buckeye Partners, L.P. (a Delaware limited partnership) against (i) Buckeye and the members of Buckeye's Board of Directors, namely, Peiter Bakker, Barbara J. Duganier, Joseph A. Lascala, Jr., Mark C. McKinley, Larry C. Payne, Oliver G. Richard, III, Clark C. Smith, Frank S. Sowinski, and Martin A. White, (collectively referred to as the "Board" or the "Individual Defendants"), for Buckeye's and the Board's violations of their obligations under the Partnership Agreement, their Delaware fiduciary duties, their implied covenant of Good Faith and Fair Dealing, their obligations under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), and U.S. Securities & Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9; and, as well against (ii) the entities who acquired Buckeye, including, IFM Investors Pty Ltd ("IFM Investors"), through its IFM Global Infrastructure Fund ("IFM GIF"), Hercules Intermediate Holdings LLC ("Parent"), and Parent's wholly-owned subsidiary Hercules Merger Sub LLC ("Merger Sub") (together, the "Buyer Defendants") for knowingly participating in the described breaches, aiding and abetting the described breaches and for unjust enrichment.   The above merger and corresponding disclosures will be referred to throughout as the "Proposed Transaction", and as actually closed, as the "Merger."

---

2 As Buckeye is a publicly traded limited partnership, owners are "unitholders" rather than "shareholders" as they would be listed with most publicly traded corporations.

5.       In this action, Plaintiff seeks to challenge the proxy statement and underlying Merger because Defendants have violated the Partnership Agreement and fiduciary duties owed the unitholders, by, among other things, agreeing to transfer income items owned by unitholders to the Buyer Defendants, failing to properly inform Plaintiff and other unitholders of the actual cash and tax ramifications of the Proposed Transaction; and conspiring together to make the Merger as tax advantageous to the Buyer Defendants and, as a result, as tax *dis*advantageous to the unitholders through engineering and closing the Merger in a manner that resulted in the transfer of almost $1 billion in assets to the Buyer, but taxed to the cashed-out unitholders. Defendants worked in concert to close the transaction in a way that would massively shift the taxation and evade even regular distributions to the unitholders, which was neither required by the Agreement, nor was it properly disclosed.  Moreover, these actions were in clear breach of the fiduciary duties and covenant of Good Faith and Fair Dealing that was owed to the Plaintiff and other unitholders, and appears to have been done at least in part through fraudulent and manipulative tax practices meant to benefit the Buyer Defendants at the expense of the unitholders.

6.       **The Cash-Out Merger Agreement.** On May 10, 2019, IFM and the Company announced they had entered into a definitive agreement and plan of merger that would culminate in the Proposed Transaction.  Under the terms of the Proposed Transaction, Buckeye unitholders were to receive $41.50 in cash in exchange for each common unit of Buckeye (the "Merger Consideration").  As such, this was a "cash-out merger" whereby the unitholders, who were all limited partners of Buckeye, were paid cash for their partnership interests.  At the time of the announcement, the Proposed Transaction was valued at approximately $10.3 billion in enterprise value and $6.5 billion in equity.

4

7.     **The Proxy Statement.** Defendants unanimously approved the Proposed Transaction and authorized the issuance of a proxy statement to be sent to individual unitholders to solicit their vote to approve the Proposed Transaction.   On June 7, 2019, Buckeye filed a Preliminary Proxy Statement on Form PREM14A with the SEC.   Buckeye filed and issued its definitive 14A Proxy Statement on June 25, 2019.[3]

8.     **The "Merger Mootness" cases filed and settled.**   As typically occurs, a number of lawsuits were filed asserting deficiencies in the proxy solicitation.   None of these lawsuits addressed the substance of the transaction as it impacted unitholders differently from the usual corporate buyout/mootness challenges.   Instead, these mootness filing followed the typical path of such lawsuits where they generally settle for a fee but without benefit to the affected shareholders.   *See* this Court's opinion in *Scott v. DST Systems, Inc.*, 1:18-cv-286-RGA (August 23, 2019) U.S. Dist. LEXIS 143596 and 2019 WL 3997097; and *see also In re Trulia, Inc. Stockholders Lit.*, 129 A.3d 884 (Del. Ch. 2016).   The Company responded to the lawsuits, filing a Supplemental Disclosure on July 22, 2019 -- less than 10 days before the scheduled vote on the Proposed Transaction (the "Supplemental Proxy")[4].   That Supplemental Proxy was apparently calculated or negotiated to moot the various proxy challenges that had been filed, which were being merger mootness settled when Plaintiff intervened, seeking Lead Plaintiff designation to assert the substantial claims herein.

9.     **The Unitholder Vote.** The unitholder vote to approve the Proposed Transaction was held on July 31, 2019 (the "Unitholder Vote").   According to the Defendants, the Unitholder

---

3  *See*  https://www.sec.gov/Archives/edgar/data/805022/000119312519180761/0001193125-19-180761-index.htm
4  *See*  https://www.sec.gov/Archives/edgar/data/805022/000119312519199055/0001193125-19-199055-index.htm

Vote was successful, resulting in a majority of the limited partner unitholders approving the Proposed Transaction. As publicly described by the Defendants, following the successful Unitholder Vote, the Proposed Transaction was scheduled to be consummated "sometime in the Fourth Quarter of 2019", but could be deferred for as long as a year or more if necessary, without any change in the price of the transaction.

10. The Supplemental Proxy that was used to procure the Unitholder Vote was materially deficient and misleading because, *inter alia*, it failed to disclose, and intentionally concealed, material information regarding the likely financial and tax impact of the cash-out merger of the partnership upon the cashed-out limited partners. As the Proposed Transaction was structured, unitholders would be taxed on more than $100 million in income that was not distributed to them, but rather kept by the new owners of Buckeye, after the Proposed Transaction was consummated. However, the Supplemental Proxy failed to meaningfully inform unitholders that this would occur, or to quantify the impact this would have on the unitholders. Additionally, the transaction violated the fiduciary duties Defendants owed to Buckeye's cashed-out limited partners, who would be taxed on more than $100 million in income (realized both before and after the Merger's closing) that, by the Partnership Agreement, is allocated to the cashed-out partners, but will actually be received by the Buyer Defendants, without consideration.

11. By unanimously approving the Proposed Transaction and authorizing the issuance of the Supplemental Proxy, the Individual Defendants participated in the solicitation even though they knew, or should have known, that the Supplemental Proxy was materially false and/or misleading. The Supplemental Proxy was an essential link in accomplishing, and receiving unitholder approval for, the Proposed Transaction.

12. **Defendants' Pre-Closing manipulations**.  After receiving unitholder approval, but prior to closing the Merger, Defendants took at least two actions that were done to directly undermine the interests of unitholders and transfer, in total, $1 billion in tax liability from the Buyer Defendants directly to the unitholders.  First, Defendants purposely chose a closing date for the Merger that would maximize the amount of income that would be taxed to the unitholders, but not distributed to them.  Second, Defendants appear to have shifted additional receivables and inventory into the Company so that when the Merger closed those receivables and inventory would be taxed to the unitholders, but, nevertheless, received by and remain assets of the Buyer Defendants.

13. **Choosing and Applying the Closing Date as precluding the regular distribution for the September 30, 2019 Quarter and the October 2019 earnings.**  Defendants conspired to select a closing date for the Merger that, as they applied it, resulted in the most tax disadvantageous result for the unitholders and the largest tax advantage to the Buyer Defendants. Specifically, Defendants selected the last day before it historically would announce and issue a regular quarterly distribution to unitholders, meaning the maximum amount of time had passed since the last distribution and therefore the maximum amount of income earned, but not distributed.  This was done so that the maximum tax benefit from the July-September 30 quarter, plus October (i.e., four months "stub" period) income could be transferred to the Buyer Defendants (with a stepped up tax basis, no less) but taxed to the cashed-out unitholders, at ordinary income, rather than capital, tax rates.  There was no requirement in the merger agreement to close at a time that would benefit the Buyer Defendants the most as a result of the tax treatment of partnership transactions, yet the Defendants wrongfully conspired against the unitholders to accomplish this massive tax transfer.

14.     **Shifting Receivables and Inventory into the Company Just Prior to the Closing to Make sure the Unitholders Paid the Taxes on Those Assets that the Buyer Defendants Would Keep after the Closing.**  Second, compounding the adverse impact on the unitholders, a cash-out merger like this results in the termination of the partnership and its tax year, and the immediate taxation of all partnership receivables (even if not due for payment until the future) and all inventory, as if it was sold at market prices on the closing date.  Defendants appear to have conspired to shift additional receivables and inventory into the Company so that the unitholders would bear the maximum amount of tax burden on these items,  with the Buyer Defendants having their tax *basis* increased, eliminating any taxable gain on the Buyer's eventual revenue from those items.

**14a**.    This incredible shift in tax liability would not be and was not known to the cashed-out unitholders until the Company issued Forms K-1 tax forms to each of the unitholders.  That K-1 statement now shows that each unitholder was taxed on roughly $7.50 of income per-unit, none of which was received by the cashed-out unitholders.  With 153 million outstanding units at the time of the Merger, that means the Buyer Defendants received the benefit of almost $1 billion, on which the unitholders are paying the taxes, something the unitholders could not have known prior to the Merger and which appears to have been done in a manner meant to specifically disadvantage the unitholders to the benefit of the Buyer Defendants, and in a maximum amount.  While all of this was known to, and intentionally crafted by the Defendants in structuring the Merger, and orchestrating the Company's preclosing operations and expenditures; and timing the closing itself; none of this was properly disclosed to the unitholders in any Supplemental Proxy statement or otherwise and is the clear result of breaches of the duties the Defendants owed to the unitholders.

15.     By way of this class action lawsuit, Plaintiff seeks to vindicate the rights of himself and all similarly situated persons who were unitholders during the period of May 10, 2019, the announcement of the Proposed Transaction, through the November 1, 2019, the closing of the Merger ("the Putative Class").

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.  This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs.

17.     **Supplemental Jurisdiction**.  Additionally, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the State law claims regarding the merger, the request for books and records relating to it, breach of contract, fiduciary duty, and the covenant of good faith and fair dealing as other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## PARTIES

18.     Plaintiff **Walter E. Ryan, Jr**. ("Plaintiff" or "Mr. Ryan"), owned 12,000 units, with a purchase date of June 13, 2017, and is suing for himself and for the Proposed Class, as defined below.

19.     The **Proposed Class** would include owners of Buckeye Units during the period from the May 10, 2019 announcement date of the Proposed Transaction to November 1, 2019, the

date the Merger closed.  Alternatively, it would also be appropriate to certify the case to proceed for just the unitholders actually cashed out November 1, 2019.

20.     Defendant **Buckeye Partners L.P.** ("Buckeye" or the "Company") is a limited partnership organized and existing under the laws of the state of Delaware, and governed by its Amended and Restated Agreement of Limited Partnership "As Amended and Restated on November 19, 2010" (and thereafter further amended in other respects, most recently on March 2, 2018) (the "Partnership Agreement"). It maintains principal executive offices at One Greenway Plaza, Suite 600, Houston, Texas, 77046. Buckeye common units are listed for trading on the New York Stock Exchange under the ticker symbol "BPL."

21.     Defendant **Pieter Bakker** has served as a director of Buckeye since 2011.

22.     Defendant **Barbara M. Baumann** has served as a director of Buckeye since 2011.

23.     Defendant **Barbara J. Duganier** has served as a director of Buckeye since 2013.

24.     Defendant **Joseph A. LaScala, Jr.** has served as a director of Buckeye since 2010.

25.     Defendant **Mark C. McKinley** has served as a director of Buckeye since 2007.

26.     Defendant **Larry C. Payne** has served as a director of Buckeye since 2014.

27.     Defendant **Oliver G. Richard III** has served as a director of Buckeye since 2009.

28.     Defendant **Clark C. Smith** has served as the Chairman, President, and Chief Executive Officer of Buckeye since 2014.

29.     Defendant **Frank S. Sowinski** has served as a director of Buckeye since 2006 and serves as the Lead Independent Director.

30.     Defendant **Martin A. White** has served as a director of Buckeye since 2010.

31.     **The Buyer Defendants**: Defendant **IFM** is an investment fund manager with principal executive offices located at Level 29 Casselden 2 Lonsdale Street, Melbourne, VIC 3000,

Australia. IFM manages IFM Global Infrastructure Fund, and owns or controls Hercules Intermediate Holdings LLC, a Delaware limited liability company ("Parent"), Hercules Merger Sub LLC, a Delaware limited liability company and a wholly owned subsidiary of Parent ("Merger Sub").

**PRE-CLOSING FACTUAL ALLEGATIONS**

**The Proposed Transaction and Failure to Fully and Fairly Disclose
the Cash and Tax Ramifications.**

32.     Although cash-out mergers of corporations are well-known, with well understood tax outcomes, the merger of partnership entities is far more complicated and less well understood.

33.     Publicly held corporations ("C Corporations") are taxable entities.  Consequently, for a cash-out merger/redemption of a C Corporation's stock, the cashed-out shareholder recognizes only the redemption consideration, and any dividends paid before the closing.  In contrast, partnerships are "pass-through" entities not subject to their own income tax.  A partnership's income, loss, assets and liabilities are treated as owned by, and thus taxed to, the unitholder/limited partner.  *See* Internal Revenue Code ("IRC"), 26 U.S.C. § 701.  Consequently, each partner is taxed on his or her share of the partnership's income for the entire period he or she is a partner.

34.     A partnership unitholder's cash-out redemption is deemed a termination of the partnership for that partner on the date of the merger's closing (*See* IRC § 706(c)(2)), with the partner's "distributive share" of all items of income (including acceleration of receivables and inventory under IRC §751, "Section 751 Income"), gain, loss, deduction or credit, taxed to the redeeming unit owner for the entire year through the closing date.  *See* IRC § 706(d)(1).

35.     As applied to this case, for the year ended on the date the Merger closed (here the Merger closed November 1, 2019), the cashed-out unit owners are being taxed on not only the

$41.50 merger consideration as a capital transaction, but also their unit share of the partnership's income (accelerating all receivables and inventory) through the closing date, regardless of the fact that the Buyer Defendants will and have received and retained all of that income, while the selling unit holders will be taxed on, but will *no*t receive *any* of that income.  More simply put, limited partners/unitholders are being taxed on an extraordinary quantum of pre- and post-closing earnings, accelerated and "bunched" into their shortened year through the closing date, without any corresponding distribution being made to the limited partners/unitholders.

36.    This is problematic because, among other things, the Partnership Agreement allocates all such items in accordance with their treatment under the federal tax laws, and apportioned in accordance with each partners' partnership units.  *See* Buckeye Partners L.P. Amended and Restated Agreement of Limited Partnership ("Partnership Agreement") at §§6.1(a), and 5.1(c)(i).

37.    This distinction was very consequential in the Proposed Transaction because the Company stated that, although the merger was expected to close "*sometime* in the Fourth Quarter of 2019", the Company would not pay any distributions to the limited partners after the merger closes, even though there would be earnings attributable to each limited partner that had not been distributed.  More specifically, the Company's May 10, 2019 earnings call[5] declared that all units will be converted into rights to receive $41.50; and while regular quarterly distributions will be made in the regular quarterly cycle (Mid-May, Mid-August, Mid-November and Mid-February, for the preceding quarters ended, March 31, June 30, September 30, and December 31), but no distributions would be made after the closing of the merger.

---

5 *See* Buckeye Partners, L.P., Proxy Statement (Schedule 14A) (July 22, 2019), *available at* https://www.sec.gov/Archives/edgar/data/805022/000110465919028656/a19-9710_8defa14a.htm.

38.     The following are quotations from Buckeye's May 10, 2019 earnings call, relevant to the claims in this case:

> **Unidentified Speaker**
> Unit holders will continue to be entitled to receive regular quarterly cash distributions, declared by the Buckeye Board, that are paid on a date prior to the closing of the transaction, but not thereafter.  We believe it, partnering with IFC in this transaction leave Buckeye well positioned to continue to operate over the long term, for the benefit of our partners as well as for our customers, our employees and our communities.
> \*\*\*
> We're going to explain more about the process in the proxy will be found a couple weeks only refer to that for pretty in-depth analysis of discussion, but the process really began with our strategic review last year, we look at, as you know, a comprehensive set of options for the company, which included all opportunities to improve value for our unit holders.
>
> We just think when you see what you're going to see in the proxy in terms of the value we are receiving upfront, the significant premium against our outlook going forward, we feel like this is the best option for our company.
> \*\*\*
> Okay, fair enough.  Kind of a few technical questions here. If there are any limits on your distributions that are being declared until the merger closes, could we see one, two or three distributions.  Just wondering if you can sort of talk about any limitations that you have on it.
>
> **Unidentified Participant**
> Well, the only limitations I mentioned in our remarks is we're going to be paying the distribution is ordinary course, till obviously the deal closes and that'll cease. So, you'll see ordinary course distributions made till the close.
> \*\*\*
> So, related to the distributions, just to be crystal clear, if the fourth quarter transaction closed timeline remains intact, does that mean you will definitely be paying the August distribution and then the November distribution will be TBT -- TBD [ph] depending on when exactly the transaction closes in the fourth quarter.

**Clark Smith, Chairman, President and Chief Executive Officer**
Just to make sure we understand the question Theresa [ph], you're saying, if we have a fourth quarter close, will we pay the August distribution, is that (multiple speakers)

**Theresa Chen, Research Analyst**
Well, you'll be definitely paying the August distribution and the fourth quarter to be paid, the distribution to be paid in the fourth quarter or for the third quarter, will it be dependent on exactly when the transaction closes, either October, November, December.

**Clark Smith, Chairman, President and Chief Executive Officer**
Yes, the August distribution will be paid, assuming a fourth quarter close, and then the payment of the fourth quarter distribution will be dependent on the timing of the close.

39.     To the average unitholder, and really anyone who is not a tax professional, these statements during the earnings call would not arouse any concern, as they suggest payments will continue to be made in the ordinary course to which owners of Buckeye have grown accustomed. Only a rare partnership tax professional might apprehend and understand the full impact of the scheduled payments and Defendants' statements: What this means is that unitholders will be taxed on substantial amounts of the Company's profits (including post-closing accelerated receivables and inventory) which will instead be received and kept by the Buyers.

40.     The Partnership's distributions, required to be made at least quarterly[6], were regularly distributed six weeks after the end of each quarter. So, an "irregular" termination of the

---

6 Buckeye Partnership Agreement, Section 5.2:
   *Section 5.2 Distributions in Respect of Partnership Interests*
   (a) From time to time, not less often than quarterly, the General Partner shall review the Partnership's accounts to determine whether distributions are appropriate. The General Partner may make such cash distributions as it may determine, without being limited to current or accumulated income or gains, from any Partnership funds, including, without limitation, Partnership revenues, Capital Contributions or borrowed funds. The General Partner may also distribute to the Partners other Partnership property, additional Units or other securities of the Partnership or other entities.
   All distributions in respect of Units shall be made concurrently to all Record Holders on the Record Date set for purposes of such distribution and shall be prorated in accordance with such

partnership might well result in some "stub period" income being taxed to, but not received by, the cashed-out unit owners in their "regular" Quarterly distributions.  But partners would anticipate that being redressed by a distribution of at least the taxed amount, shortly thereafter.

41.     And, while the partnership's distributions have generally been at least equal to the partnership's income (due to pipelines' cashflow and depreciation, distributions usually reflect cashflow not capped by income, and indeed Buckeye's Partnership Agreement explicitly approves distributions "without being limited to current or accumulated incomes or gains, from any Partnership funds..."), the result in *this* Proposed Transaction was that at least one-quarter's distributable cashflow was taxed to the cashed-out partners, but actually received and kept by *the Buyer Defendants*, as additional cash for which they have not paid anything and will not be taxed.

42.     When this case was originally filed, Plaintiff estimated that the "stub period" income would likely be between \$.75 and \$1.25, based on historical distributions.  While \$.75-\$1.25 per unit may not seem like a large amount on a per-unit basis, multiplied by 153 million units (actually 153,923,492, per Buckeye's September 30, 2019 Form10-Q filed), it amounts to \$115 million to \$192 million in quarterly cash shifted tax-free to the Buyer Defendants, but actually taxed to the cashed-out unit owners, despite the fact that they did not receive it.

43.     **The additional Section 751 Income on Inventory and Receivables**. Compounding this problem is the fact that the applicable Internal Revenue Code provisions require accelerating the Partnership's receivables and inventory as well; *i.e.*, treating them as additional ordinary pass-through income on the closing date.  *See* IRC § 704(c).  When the case was originally filed, Plaintiff noted this could add substantial additional income to the cashed-out limited

---

Record Holders' respective Percentage Interests as of such Record Date.

partners' taxable income as well (again, which they would only discover when they receive their K-1 reports in the year following the merger's closing).

44.     The Accounts Receivable shown on the Company's 2018 annual report totaled $219.751 million (approximately $1.47 per unit) and in the Company's 10-Q for the period ended June 30, 2019, the Accounts Receivable total $217,430,000 (approx. $1.42 per unit), indicating Buckeye had been maintaining relatively consistent receivables.  Assuming these are the amounts accelerated, Plaintiff originally offered that this would constitute an additional $218 million ($1.42 per unit) in ordinary income which will be taxed to the cashed-out limited partners, but actually received as tax-free additional cash for the buyer.

45.     The total of just these two tax consequence items discussed above would constitute a gift of more than $330 million to the Buyer Defendants, which the cashed-out unit holders will learn as a taxable income surprise in their next year's K-1.  Most importantly, this was not fairly disclosed nor quantified for the unitholders in the Supplemental Proxy statement, even though the Company had this information available to it at the time.

46.     And there is yet more. Section 751 includes in its definition of "unrealized receivables", "the amount that would have been allocated to the partner if the partnership had sold all of its property for cash at fair market value, in a fully taxable transaction, immediately prior to the partner's transfer of interest in the partnership." *See* IRS Publication 541 at 12 "Other items treated as unrealized receivables.

47.     What this means is that the Partnership's inventory of oil and gas assets are treated as if they'd been sold at current market prices just prior to the closing.  As reported by the Partnership, these items had, at the last reported September 30, 2019 period, a carrying value of

$98,889,000 (about $0.67 per unit), although the actual quantity of inventory and amount of profit at closing date market pricing was known only by the Defendants.

48.     And, lest there be any uncertainty about how this additional income is taxed: "Any gain or loss recognized that is attributable to the unrealized receivables and inventory items will be ordinary gain or loss." *See id.* at IRS Publication 541)

49.     The only mention of this in the Proxy Statement is well-buried in the tax explanation and only generically discusses the issue in a way that none of the unitholders who are not tax lawyers themselves would understand, let alone be alerted to the amount of the impact on them:

> Partnership Items of Income, Gain, Loss and Deduction for the Taxable Period Ending on the Date of the Effectiveness of the Merger
> U.S. holders of Partnership Units will be allocated their share of the Partnership's items of income, gain, loss and deduction for the taxable period of the Partnership ending on the date of the effectiveness of the merger. These allocations will be made in accordance with the terms of the Limited Partnership Agreement. A U.S. holder will be subject to U.S. federal income tax on any such allocated income and gain even if such U.S. holder does not receive a cash distribution from the Partnership attributable to such allocated income and gain. Any such income and gain allocated to a U.S. holder will increase the U.S. holder's tax basis in the Partnership Units held and, therefore, will reduce the gain, or increase the loss, recognized by such U.S. holder resulting from the merger. Any losses or deductions allocated to a U.S. holder will decrease the U.S. holder's tax basis in the Partnership Units held and, therefore, will increase the gain, or reduce the loss, recognized by such U.S. holder resulting from the merger.

50.     This nondescript provision makes no alert to the differences between corporate and partnership cash-outs, and no warning that unitholders will be taxed on their full share of partnership income for the entire year through the closing date, nor does it disclose at all that the

17

income they are being taxed on will be in addition to their merger consideration, and no mention whatsoever of the amounts.

51.     The generic tax explanation also fails to disclose that the amounts not distributed to the limited partners represents cash that is being kept for the Buyer Defendants, who, after the closing, will be able to just distribute that amount back to themselves, reducing the actual cost of the acquisition by hundreds of millions of dollars, if not more. There is simply no justification for the buyer to retain this stub-period income rather than just distribute it to the rightful owners, the cashed-out unitholders after the merger closes, and more importantly, to the party that will incur the tax liability.

52.     The Company's and Defendants' agreement to such a provision, a gift to the buyer totaling hundreds of millions of dollars (or more) rightfully belonging to and taxed to the cashed-out unit owners, is a clear breach of fiduciary duty and the covenant of Good Faith and Fair Dealing which this Court can remedy by an equity order to transfer the amounts to the cashed-out unitholders.

53.     This was not just a business judgment decision, but rather, the Individual Defendants were clearly conflicted in their decision to support the manner in which the Company's pre-closing finances were conducted, and the manner in which the Proposed Transaction would be closed.  Indeed, the Individual Defendants' negotiated substantial acceleration of compensation and severance protections for their own tenure and compensation at and after effecting the transfer of ownership to the buyer, yet omitted any protection of their unitholders.  More specifically, the Individual Defendants received acceleration of their previously deferred compensation that is worth roughly $43 million to the Individual Defendants, a clear benefit to the Individual Defendants that would not be extended to other unitholders.  In addition, the Individual Defendants

negotiated severance benefits and protections for themselves valued at almost an additional $9 million.  Again, this is a benefit the Individual Defendants received that was not provided to the other unitholders.

### Plaintiff's Books and Records Demand and Defendants' Rejection

54.     Upon learning of the Proposed Transaction, and studying available public announcements, Lead Plaintiff Ryan had a reasonable basis to believe that directors and senior officers of Buckeye had breached their fiduciary duties by agreeing to merger terms which transfer, to the buyers, cash and earnings that actually belong to the selling unit owners, and on which the unit owners will be taxed, while the buyer receives the cash and earnings without cost or tax.

55.     In order to confirm this belief, Plaintiff sought to enforce his right to inspect certain corporate books and records of Defendants, who rejected the demand.

56.     Following public notice of the Company's entering into a cash-out merger with IFM, and noting some of the issues regarding distributions and timing, Mr. Ryan, on June 14, 2019, made a demand to Inspect Documents Pursuant to 6 *Del. C.* § 17-305 (the limited partnership version of the Corporate § 220 provision), seeking a number of items relative to the announced cash-out merger; particularly referencing both the five-year forecasts mentioned in the original proxy, and documents relating to issues of income and distributions of income for periods prior to the closing.  (The last item is particularly relevant to the problem that income taxed to the outgoing unitholders will, under the structure of the Merger, exceed the distributions the limited partner unitholders will actually receive.)

57.     On June 21, 2019, the Company responded (through its attorneys) rejecting the demand as overbroad, and as having insufficiently identified a basis to suspect wrongdoing.

58.     Accordingly, on July 2, 2019, Mr. Ryan's counsel made a revised demand, which the Company on July 10, 2019 again rejected, as "substantively identical" to the prior demand.

59.     After Plaintiff Ryan's attorney, Mr. Krislov, had a telephone conversation with the Company's attorney, Ms. Leraris, Mr. Krislov emailed Ms. Leraris, limiting the demand to two specific items:

> At the moment, we would limit our demand to the following:
>
> 1-all versions of the "five year financial forecast" that were identified in the proxy-there is no reason to withhold this information, since everyone involved in the negotiations of the transactions, including all of the outside potential buyers, have had access to this document, except only the unit owners. It utterly escapes me how it can be justified to withhold access from just the people most needing this information.
>
> 2-documents relating to the negotiation and terms of the transaction that terminate distributions on the date of closing, rather than making distributions of all profits to the closing. It escapes us as well as to why the buyer is entitled to any profits earned prior to the closing date.

60.     Once again, the Company's attorneys on August 8, 2019 rejected even this demand:

> Clint,
>
> You still have not articulated a proper purpose for your demand because you have not articulated a credible basis upon which a court could conclude under Delaware law that there has been mismanagement or wrongdoing. That said, please help us understand what additional information you are looking for that was not already disclosed in the proxy. On 1, the proxy already discloses the forecasts that were shared with IFM and other potential purchasers. (See pages 63-68.) And on 2, the treatment of distributions was expressly discussed during the negotiations and, taking into account all of the terms and conditions under negotiation in the draft merger agreement at the time, Buckeye ultimately accepted the provisions appearing in the final agreement in the interest of securing the most favorable value and merger terms from IFM on the whole.

Best,
Rory

61.   Plaintiff's counsel then on August 8, 2019 emailed:

Rory,

The presentation on pages 63-68 are just summaries; we would
like to see the actual 5-year forecasts the board reviewed, and
those presented to buyers.
As to the distributions, the unit owners own their share of the
earnings during any period they are the owners, regardless of
when they are distributed.
For example, if the closing takes place at the end of a fiscal
quarter, then the unit owners are the owners of those earnings,
even if they would be distributed later.
The idea that the buyer would get to keep any pre-closing
earnings seems to squarely violate the unit owners' ownership
interests.
So the information on how this came about is clearly an
appropriate inquiry by unitowners; especially when both of the
items to which we're currently limiting our demand, have been
in everyone's possession except the people whose interests are
affected.
Please reconsider and send the requested information over.

Clint

62.   To which the Company's lawyers responded August 14, 2019:

Clint,

You continue to ask for information you are not entitled to under
Delaware law because, among other reasons, you still have not
stated a proper purpose.  Nevertheless, and without waiver of
any of Buckeye's rights, I write in an effort to help clarify some
misconceptions you appear to be under.

Regarding your first request, the presentation on pages 63 - 68
of the proxy reflects the actual 5-year forecasts reviewed by the
Board and shared with IFM and other potential purchasers and
are not just summaries.

Regarding your second request, while Buckeye has historically
paid a quarterly cash distribution in respect of its units, this is
done at the discretion of the board of directors of the General

21

Partner of Buckeye.  Per Buckeye's publicly available Limited Partnership Agreement, the General Partner reviews Buckeye's accounts on a quarterly basis to determine whether distributions are appropriate and may, but is not required to, cause Buckeye to make such distributions as the General Partner may determine. Unitholders do not have any entitlement to cause Buckeye to make distributions of earnings under either the LPA or applicable law.  Further, the unitholders' units represent an ownership interest in Buckeye, and the merger consideration of $41.50 per unit that was agreed with IFM reflects the compensation to be received by each such holder for its ownership interest in Buckeye on the terms and conditions of the merger agreement (including the treatment of distributions at or prior to the closing). Both the merger consideration of $41.50 per unit and the treatment of distributions are part of the economic terms of the transaction that were subject to extensive negotiations with IFM and were resolved in a manner that was approved by the board of directors of the General Partner of Buckeye and by over 96% of the Buckeye unitholders voting at the special meeting held on July 31, 2019.

Thanks,
Rory

63.     As a result, despite multiple attempts to obtain the records needed to determine the significance of the consequences of the Proposed Transaction and whether Defendants knowingly breach their duties to Plaintiff and all of the other limited partners, Defendants refused to provide the records, necessitating this lawsuit.

**Earlier Proxy Claims were Mooted by the Company's July 22, 2019 Supplement to the Proxy, but the Issues Raised in this Complaint were not Mooted as they have not been Previously Asserted.**

64.     Following the Company's June 7, 2019 proxy soliciting unitholder approval, at least five lawsuits were filed in response (two issuing July 8, 2019 notices of 60-day deadline [*i.e.*, September 6, 2019] for filing lead plaintiff under the Private Securities Litigation Reform Act.) Those claims addressed only a minor arguable omission of information concerning Wells Fargo's

financial analyses, and the potential conflicts of interest faced by Intrepid in advising the Company to enter into the Proposed Transaction.

65.     In the view of those filers, all their claims were purportedly rendered moot by the Company's July 22, 2019 Supplemental Proxy Statement[7].However, the issues raised by Mr. Ryan here are actual money impact matters which had not been addressed or adequately disclosed.

66.     Accordingly, Plaintiff intervened in this cause, and obtained lead plaintiff designation, suing to remedy the actual cash and tax injury that Company unitholders have suffered and will continue to suffer absent judicial intervention.

**Defendants' Decision to Close the Merger on November 1, 2019 and Preclude Regular Distribution of the September 30 Quarter's Distributions to Unitholders.**

67.     On October 22, 2019, the Company issued a press release announcing that the Company had received all necessary regulatory approvals, and intended to close the merger transaction just before the market opening on November 1, 2019:

http://buckeye.com/LinkClick.aspx?fileticket=KxSMmfU1tPg%3d&tabid=83&mid=1635:

1.  News Release NYSE: BPL Buckeye Partners, L.P. One Greenway Plaza Suite 600 Houston, TX 77046 Contact: Kevin J. Goodwin Vice President & Treasurer irelations@buckeye.com (800) 422-2825 Buckeye Announces Regulatory Approvals and Planned Closing Date of Pending Acquisition HOUSTON, October 21, 2019 — Buckeye Partners, L.P. (NYSE: BPL) today announced that all regulatory approvals required to complete the acquisition of Buckeye by entities affiliated with the IFM Global Infrastructure Fund previously announced on May 10, 2019 (the "proposed merger") have been received. The merger agreement relating to the proposed merger and the transactions contemplated thereby were previously approved by the affirmative vote of the holders of a majority of Buckeye's outstanding limited partner units on July 31, 2019. The completion of the proposed merger is currently expected to occur prior to market opening on Friday, November 1, 2019,

---

7 Buckeye Partners, L.P., Proxy Statement (Schedule 14A) (July 22, 2019), *available at* https://www.sec.gov/Archives/edgar/data/805022/000110465919028656/a19-9710_8defa14a.htm.

subject to the provisions of the merger agreement, including the satisfaction or waiver of customary closing conditions. As previously announced, upon completion of the proposed merger, Buckeye's outstanding limited partner unitholders will receive $41.50 per unit. In accordance with the terms of the merger agreement, if the completion of the proposed merger occurs on Friday, November 1, 2019 as currently expected, Buckeye's general partner would not declare or pay a cash distribution for the quarter ended September 30, 2019.

68.     The decision to close the transaction on November 1 is no coincidence.  Rather, it displays the Defendants' decision to maximize the value transferred from the cashed-out limited partners to the Buyer Defendants.

69.     Based on past practice, the Company's <u>declarations</u> of the distribution of earnings for the quarter ended September 30 occurred during the first week of November.  For example, the Company's 2018 declaration of distribution for 2018's September 30 quarter was done on November 2, 2018.[8] So, the chosen closing date for the Merger was the day before the Company would have normally announced a distribution to unitholders, which would be distributed by November 15.

70.     This November 2nd or earlier date is not an anomaly.  Rather, it is the practice of the Company to make the distribution announcement in mid-October to early-November.

71.     For 2017, the declaration of distribution for the September 30 quarter was done on November 3.[9]

72.     For 2016, the declaration of distribution for the September 30 quarter was done on October 24.[10]

---

8 http://buckeye.com/LinkClick.aspx?fileticket=reVgyhkVi2k%3d&tabid=83&mid=1635.
9 http://buckeye.com/LinkClick.aspx?fileticket=Nx7a8XVXWmM%3d&tabid=83&mid=1635
10 http://buckeye.com/LinkClick.aspx?fileticket=V0kqE97MyG8%3d&tabid=83&mid=1635

73.     For 2015, the declaration of distribution for the September 30 quarter was done on October 30.[11]

74.     For 2014, the declaration of distribution for the September 30 quarter was done on November 7.[12]

75.     Viewed another way, the timing of the Company's notice of its declaration, and its earnings and distribution declarations for the September 30 Quarter have been always declared no later than the first week of November:

| Year for 3rd Quarter | Earnings Release Date Announcement | Earnings and Distribution Declaration |
|---|---|---|
| 2011 | October 18, 2011 | November 4, 2011 |
| 2012 | October 15, 2012 | November 2, 2012 |
| 2013 | October 11, 2013 | November 1, 2013 |
| 2014 | October 21, 2014 | November 7, 2014 |
| 2015 | October 9, 2015 | October 30, 2015 |
| 2016 | October 7, 2016 | October 24, 2016 |
| 2017 | October 6, 2017 | November 3, 2017 |
| 2018 | October 26, 2018 | November 2, 2018 |
| 2019 | October 21, 2019 | **No Distribution** |

76.     Accordingly, by the Company's customary practice, the announcement of the September 30 quarter's earnings, *and their regular distribution*, was made in late October-early November, typically by November 2.

---

11 http://buckeye.com/LinkClick.aspx?fileticket=t2lySgovrCs%3d&tabid=83&mid=1635
12 http://buckeye.com/LinkClick.aspx?fileticket=IjCeR9zY8xY%3d&tabid=83&mid=1635

77.     By choosing to close the Merger on the usual declaration date, the Defendants unfairly and <u>wrongfully</u> assert that they are not required to make the regular quarterly distributions for the preceding quarter that the Company would have declared that date.

78.     The choice of closing the Merger on November 1, 2019 was obviously done intentionally to evade the declaration of the regular distribution for the September 30, 2019 quarter, and artificially maximize the value transferred from the unitholders to the Buyer Defendants. Moreover, the choice of closing was totally within the control and decision of the Defendants, and they exercised their asserted discretion to maximize the benefits to the Buyer Defendants, without considering the legitimate obligation, authority and custom, to allocate all such items to the unitholders.

79.     Nothing in the Supplemental Proxy nor the Merger Agreement requires or advises that the closing will be chosen or structured by Management and the Buyer Defendants in a manner calculated to maximize the benefits to the Buyer Defendants and maximally *dis*advantage the unitholders.

80.     Similarly, nothing compels or justifies the Defendants in selecting that closing date together with their refusal to declare regular distributions within the typical dates the Company has made that declaration , nor to even request the Buyer Defendants' approval to make distributions of taxed earnings, since even the Partnership Agreement (at Section 5.01(b)) explicitly provided that "(such consent not to be unreasonably withheld, delayed or conditioned)".

81.     To the contrary, it was a clear breach of fiduciary duty and of the implied covenant of Good Faith and Fair Dealing, for the Company and the Individual Defendants to select a closing date to favor the interests of the Buyer Defendants over the interests of the unitholders, to whom they were bound as fiduciaries to put first.

## POST-CLOSING EVENTS.

82.     After the closing, Defendants have defiantly refused to cooperate or transparently provide unitholders any required information in even the most minimal ways.

83.     **Late-filed K-1 Tax Returns**.  Although the Partnership's federal income tax return for the shortened November 1, 2019 year was due to be filed by February 15, 2020 (the 15th day of the Third month following the end of the year), Plaintiff's Counsel's repeated inquiries were met with no explanation for the late tax return, including Plaintiff's K-1, by the appropriate deadline.

84.     **Substantial Unusual Ordinary Income to Cashed-out Unitholder partners.** When the Defendants did eventually file the Partnership's tax return for the shortened year, the return showed a number of items that were substantially different from previous financial reports.

85.     Specifically, the ordinary income figure, which had been running at the $3 annual per unit rate through the September 30, 2019 quarter, now showed an ordinary business loss of approximately $1.29, but Section 751 (ordinary income) *gain* of $7.08 per unit.  As applied to the 153 million units affected, this represents approximately $1 Billion in post-closing partnership revenues received and retained by the Buyer Defendants, but taxed as ordinary income to the redeemed unitholder partners, of which those unitholders received nothing distributed to them.  In contrast, the Defendants not only retained this income for themselves, but achieved a tax benefit from the exercise, allocating this portion of their acquisition cost to these assets, and thus stepping up their tax basis by that amount, and sheltering the post-closing revenues from accounts receivables and sales of oil and gas inventory from tax, it having been taxed to the cashed-out unitholders.

86.     This net $7.00 per unit § 751 ordinary income substantially exceeded the approximately $4 per unit in receivables and inventory shown on the company's 10-Q at September 30, 2019 (the last period for which such figures are public).

**Refusal to Respond to Requests for the calculation of Section 751 income imposed on the Cashed-out unitholders**.  Per Defendants' obligation to its unitholders, the Forms K-1 included the following statement, offering the cashed-out unitholders access to the Section 751 calculations "upon request":

### IRC SECTION 751 STATEMENT

> The taxpayer has reported ordinary income upon the disposition of units in Buckeye Partners, L.P. as provided by the General Partner. The amount was determined in accordance with Internal Revenue Code Section 751 and the detailed information is available in the offices of the General Partner upon request.

87.     Concerned that Defendants appear to have artificially loaded the Partnership with Section 751 assets to tax-benefit themselves at the cashed-out unitholders' expense, Plaintiff, by counsel, repeatedly requested the Section 751 tax calculations.  However, to date, all such requests have been refused; Defendants' counsel having initially asserted that the information could only be obtained in person at Buckeye's offices (which were closed for the COVID-19 pandemic) and then subsequently asserting that the calculations were too voluminous and complicated for any alternative way to provide them.  Defendants have stated that the information could not be just "pdf'd" and provided, most recently (by August 7, 2020 email from Cravath attorney Crider) that following the Merger, Plaintiff no longer had any right to the Section 751 calculation information at all.

## CLASS ACTION ALLEGATIONS

88.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

89.    Plaintiff brings this action for himself an all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that owned Buckeye common units from May 10, 2019 through November 1, 2019 (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

90.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

### Rule 23(a) Prerequisites.

91.    **Numerosity/Numerousness**. FRCP 23(a)(1)  The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of June 30, 2019, there were 153,920,704 Company units outstanding.  All members of the Class may be identified from records maintained by Buckeye or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that which is customarily used in securities class actions.

92.    **Common Questions.** FRCP 23(a)(2) Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a) Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b) Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

29

(c) Whether Defendants have violated their fiduciary duties to unitholders by agreeing to the transfer of taxed income;

(d) The amount of partnership income that will be taxed to the cashed-out unitholders, but received by the buyers;

93.     **Typicality.** FRCP 23(a)(3) The Plaintiff's claims, that the Defendants have wrongfully transferred the interests of the unitholders to the buyers and the unitholders will be subject to taxation on income actually enjoyed by the buyers, are typical of the claims of all of the cashed-out unitholders.

94.     **Adequate Representation**.  FRCP 23(a)(4) Plaintiff will fairly and adequately protect the interests of the Class and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

<u>**Appropriate Category/Type of Action**</u>. **FRCP 23(b).**

95.     The action is appropriately categorized as one within both (b)(2) and (b)(3).

96.     Insofar as the breach of fiduciary duty claim, it is appropriate for declaratory relief, because the income transfer is identically a violation as to all unitholders.

97.     **FRCP 23(b)(2).** Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, corrective injunctive relief on behalf of the Class is appropriate.

98.     **FRCP 23(b)(3).** This is a money damages case seeking money due to the Class for violations of law and breaches of duty.

99.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### *FIRST COUNT*

### Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

100.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully stated herein.

101.    The Individual Defendants disseminated the false and misleading Proxy and Supplemental Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Buckeye is liable as the issuer of these statements.

102.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy and Supplemental Proxy.

103.    The Individual Defendants were at least negligent in filing the Proxy and Supplemental Proxy with these materially false and misleading statements.

104.    The omissions and false and misleading statements in the Proxy and Supplemental Proxy are material in that a reasonable unitholder would have consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Supplemental Proxy and in other information reasonably available unitholders.

31

105.    The Proxy and Supplemental Proxy were an essential link in causing the Company's unitholders to approve the Proposed Transaction.

106.    By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

107.    Because of the false and misleading statements in the Proxy and Supplemental Proxy, Plaintiff suffered harm.

### *SECOND COUNT*

### <u>Violation of Section 20(a) of the Exchange Act</u>

108.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully stated herein.

109.    The Individual Defendants acted as controlling persons of Buckeye within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Buckeye and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy and Supplemental Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

110.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and Supplemental Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

111.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy and Supplemental Proxy contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Proxy and Supplemental Proxy.

112.   By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

113.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered harm.

### *THIRD COUNT*

### **Breach of Contract**

114.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

115.   The unitholders' rights and the Defendants' obligations are controlled by the Partnership Agreement.

116.   The Defendants' causing income items allocated to the unitholders to be instead transferred to the Buyer Defendants constitutes a Breach of the Partnership Agreement.

### *FOURTH COUNT*

### **Breach of Fiduciary Duty**

117.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

118.    Defendants each individually and collectively owe fiduciary duties to Plaintiff as a result of being partners and the obligations directors owe to unitholders, such as Plaintiff.

119.    Defendants' agreement and commitment to capture substantial income for the Buyer Defendants, which will be taxed to the cashed-out unitholders, constitutes a breach of their fiduciary duties to Buckeye's unitholders.

120.    Defendants have negotiated roughly $50 million in accelerated benefits plus multi-year severance benefit arrangements with IFM to reward themselves and retain their positions after the acquisition.  As a result, Defendants have a personal interest in the outcome of the transaction.

121.    To the extent this tax consequence to the investors was unrealized and/or inadvertent by the Defendants, the transaction is a violation of the duty of care for Defendants' failure to properly analyze and discover the potential tax consequences for the investors prior to structuring the transaction, recommending the transaction the unitholders, and failing to disclose the tax consequences in the proxy statement.

122.    To the extent this tax consequence was known to Defendants, their decision to structure the transaction with this consequence, recommend the transaction the unitholders, and intentionally not disclose the tax consequences in the proxy statement constitutes a breach of both Defendants duty of good faith and duty of loyalty.

123.    Moreover, the actions taken after the approval of the Proposed Transaction, but before the completion of the Merger, provide clear instances of breaches of loyalty and good faith and fair dealing.  First, deciding to close the Merger on a date that would maximize the tax benefit for the Buyer Defendants at the explicit expense of the unitholders was a disloyal action and not done in good faith, despite Defendants continuing to owe fiduciary duties to the unitholders, not the Buyer Defendants.  Second, manipulating the Company's books in such a way as to add to the

34

Company's Section 751 income (accelerated receivables and inventory) was an additional breach of fiduciary duty owed to Plaintiff wherein Defendants were disloyal and did not operate in good faith.

124.    These violations are not protected by the business judgment rule, as Defendants' are interested in the transaction.

125.    Defendants' actions fail Delaware's requirement of "Entire Fairness" in such transactions. *See, e.g.*, *Cede v. Technicolor*, 634 A.2d 345 (Del. 1993).

## FIFTH COUNT

### Covenant of Good Faith and Fair Dealing

126.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

127.    The Defendants' conduct, in (i) choosing to close the merger on November 1, 2019 in order to evade making the regular distribution for the September 30, 2019 quarter, and the October month's income, (ii) conducting the Partnership's operations to financially maximize the value transferred to the Buyer and tax cost to the cashed-out unitholders, and (iii) obdurate refusal to provide Section 751 calculation information to the cashed-out unitholders, were, whether considered separately or together, were voluntary decisions and actions knowingly made by the defendants, that were purely self-benefiting to them, and unfair to the unitholders who were cashed out in the Merger..

128.    None of these actions were required or explicitly addressed by either the Partnership Agreement or the applicable Merger Agreement.

129.    The Defendants' conduct described above violates the Covenant of Good Faith and Fair Dealing implied in all contracts.

## SIXTH COUNT

## Declaratory and Injunctive Relief

130.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

131.    Defendants have initiated a corporate action in the form of a sale of the Company by way of a materially deficient proxy statement, and where the terms of the sale are in violation of Defendants' duties to the unitholders.

132.    Accordingly, Plaintiff seeks declaratory relief from this Court that the proxy statement was invalid, that the shareholder vote based upon it is also invalid and that, as a result, the sale of the Company to IMF has not been authorized by the unitholders to consummate the transaction.  Plaintiff seeks class-wide injunctive relief and damages from this Court to effectuate this Declaration.

### *SEVENTH COUNT*

### Aiding and Abetting

133.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

134.    As described above, there is an underlying violation of the Securities Act, the Partnership Agreement, and fiduciary duties owed by Buckeye and the Individual Defendants to Plaintiff.

135.    The Buyer Defendants knew (or should have known) and actively participated and benefited from such underlying violation by way of their involvement in the negotiation of the transaction and their review of the relevant proxy materials.

136.    The Buyer Defendants also participated with, and conspired with, the Company and the Individual Defendants to further breach the duties owed to Plaintiff and other class members

after the approval of the Proposed Transaction, but prior to the closing of the Merger, as described above.

137.   The Buyer Defendants provided material aid in the transaction as, without the Buyer Defendants' willingness to consummate the transaction on the basis of these deficient proxy materials and subsequent breaches, there would be no harm to the investors.

### *EIGHTH COUNT*

### <u>Unjust Enrichment</u>

138.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

139.   Defendant IFM and its related Buyer Defendants have been or will be unjustly enriched to the investors' detriment by receiving the value of income to Buckeye without the corresponding tax liabilities for such income.

140.   To allow IFM to benefit from this shifting of liabilities without the knowledge or consent of the investors constitutes unjust enrichment to IFM.

### <u>DEMAND FOR JURY TRIAL</u>

141.   Plaintiff demands a trial by jury on all counts so triable.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all Class members the following relief against the Defendants:

A.   Certify the case to proceed as a class action for all of the unitholders redeemed in the Merger,

B.   Declare that the Defendants' manipulating the Merger, the Company's pre-closing operation, and their closing of the Merger, and by, among other things, concealing the tax calculations, retaining the taxed income in excess of distributions to closing separately

37

and together, constitute a breach of the Partnership Agreement, a breach of fiduciary duty, and a breach of the Covenant of Good Faith and Fair Dealing, for which the Company should be ordered to render a full accounting and disclosure, and distribute the amount of taxed income to the unitholders;

C. An Order rescinding and setting aside the Merger or awarding rescissory damages;

D. Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E. Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

F. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' fees and experts' fees; and

G. Such other relief as the Court deems just and proper.

Dated: August 18, 2020

**Respectfully Submitted,**
**Walter E. Ryan, Jr.**
**Lead Plaintiff**

**COOCH AND TAYLOR, P.A.**
*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
bbennett@coochtaylor.com
1007 N. Orange St., Suite 1120
P.O. Box 1680
Wilmington, DE  19899-1680
Telephone: (302) 984-3889
Facsimile: (302) 984-3939

*Attorneys for Plaintiff and the Proposed Class*

**OF COUNSEL:**

**KRISLOV & ASSOCIATES, LTD.**
Clinton A. Krislov (*Pro Hac Vice*)
clint@krislovlaw.com
Kenneth T. Goldstein
ken@krislovlaw.com
Christopher M. Hack
chris@krislovlaw.com
20 North Wacker Dr.
Civic Opera Building, Suite 1006
Chicago, IL 60606
Telephone:  (312) 606-0500
*Lead Plaintiff's Counsel*

and

**SHEPHERD, SMITH, EDWARDS
  & KANTAS, LLP**
Samuel B. Edwards
SDTX Bar No 24031634
sedwards@sseklaw.com
Ryan Cook
SDTX Bar No 2273136
rcook@sseklaw.com
1010 Lamar, Suite 900
Houston, TX 77002
Telephone: (713) 227-2400
Facsimile: (713) 227-7215

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed using the

Court's electronic filing system. Notice of this filing will be sent by operation of the Court's

electronic case filing system to all parties indicated on the filing receipt. Parties may access this filing

through the Court's electronic filing system.

Dated:  August 17, 2020

*/s/ Blake A. Bennett*
  Blake A. Bennett (#5133)